## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO.  3:23-CR-00173-02 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| JAMES ARD (02) | MAG. JUDGE KAYLA D. MCCLUSKY |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress [doc. #155] filed by Defendant James Ard.  The motion is opposed.  [doc. #181].  For reasons stated below, it is recommended that the motion be DENIED.

### Background

In the winter of 2022, during an investigation of a multi-drug operation in the northeastern region of the Western District of Louisiana, agents of the Drug Enforcement Administration ("DEA") identified James Ard ("Ard") as a participant.  (Gov't Response [doc. #181, p. 2]).  Agents developed a confidential source who had previously purchased narcotics directly from Ard.  (Gov't Exhibit 4 [doc. #181-4, p. 12, ¶20]).  The confidential source had proven to be a reliable source for Monroe Police Department ("MPD") in the past and for the DEA "moving forward in the future."  *Id.* n. 13.  The confidential source's motivation was a combination of working for lenience on charges, as well as compensation for providing information and conducting controlled purchases.  *Id.*  Through five controlled purchases of methamphetamine and cocaine between the confidential source and Ard, DEA agents were able to establish Ard's drug dealing.  (Gov't Exhibit 4 [doc. #181-4, p. 14, ¶26]).  One of those controlled purchases took place on January 19, 2023.  *Id.* at p. 15, ¶26.

On February 22, 2023, the undersigned signed a pen register application for the telephone number (318)-557-5193, used by Ard. (Gov't Response [doc. #181, p. 2]). Pen registers provide only identifying information regarding calls and text messages sent and received, without identifying the individuals involved in the communications. (Gov't Exhibit 4 [doc. #181-4, pp. 23-24, ¶49]). Additionally, pen registers do not disclose the content of any communications. *Id.*

Agents suspected that the conspiracy to distribute and possess controlled substances involved three different groups operating through their respective leaders, with Ard believed to be one of these leaders. (Gov't Exhibit 4 [doc. #181-4, p. 5, ¶7]). Consequently, agents sought orders authorizing the interception of wire and electronic communications for Ard's telephone number. (Gov't Response [doc. #181, p. 2]). Ard's involvement was established through the confidential source's information and controlled purchases, but these operations did not reveal Ard's sources of supply or their assets. (Gov't Exhibit 4 [doc. #181-4, p. 26, ¶55]). Investigators also aimed to uncover any co-conspirators who had not yet been identified. *Id.* at p. 27, ¶56. Pen register information and other investigative methods such as physical surveillance, pole cameras, vehicle-tracking devices, and trash pulls had been unsuccessful in fully identifying the sources of supply and co-conspirators. *Id.* at p. 27, ¶¶57-58. The affiant and investigators believed that intercepting wire communications was the only remaining technique likely to achieve the investigation's objective. *Id.* at p. 27, ¶56.

The orders authorizing the interception of wire and electronic communications were signed on June 7, 2023. (Gov't Response [doc. #181, p. 2]). All communications intercepted during the course of the wire intercepts were first heard and minimized at the Monroe DEA office. *Id.* Agents were instructed by the Assistant U.S. Attorney to minimize non-pertinent and privileged calls, and

both the Assistant U.S. Attorney and agents signed the written document affirming the minimization requirements. *Id.*; (*see* Gov't Exhibit 1 [doc. #181-1, pp. 1-9]).

During the interception period, agents intercepted numerous conversations between Ard and other individuals regarding the purchase, acquisition, and distribution of methamphetamine. *Id.* Over the thirty days, the wiretap intercepted 1,746 calls and 1,946 text messages, of which 1,220 calls and 1,506 text messages were deemed non-pertinent and were minimized. *Id.* On or around June 11, 2023, a phone call between Ard and Co-Defendant Trentin Parks ("Parks") was intercepted, wherein they immediately began discussing illegal narcotics and methods for manufacturing and selling them. *Id.* at p. 3. In a conversation regarding the production of synthetic marijuana, Ard stated: "[f]igure out how to make the mojo." *Id.* Subsequently, on June 15, 2023, a phone call between Ard and Co-Defendant Brandon Wright ("Wright") was intercepted. *Id.*

As a result of the investigation, a federal grand jury returned a three-count indictment against Ard on August 7, 2024, charging him with (1) conspiracy to distribute and to possess with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846; (2) distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), and 18 U.S.C. § 2; and (3) possession with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 18 U.S.C. § 2. Ard was arraigned on August 21, 2024, whereupon he entered a plea of not guilty as to each count.

On July 22, 2024, Ard filed the instant Motion to Suppress all evidence derived from the pen register order and the wiretap order. (M/Suppress [doc. #155, p. 2, 8, ¶¶4, 15]). He also requested a hearing on the motion. *Id.* at p. 8. Ard advanced six arguments for suppression: (1) the affidavit supporting the wiretap application was tainted by the failure to disclose that the confidential source had been arrested for withholding controlled purchase money and narcotics;

(2) the wiretap application did not adequately demonstrate that other investigative procedures had been tried and failed or were unlikely to succeed if tried, or that they were too dangerous; (3) the interception of communications had no implication of minimization; (4) the pen register application was tainted, should be suppressed, and failed to comply with Federal Rule of Criminal Procedure Rule 41; (5) the intercepted conversations between Ard and Parks and Ard and Wright failed to have one individual that was a party to the conversation be named in the wiretap order; and (6) his arrest violated the silver platter doctrine. (*See* M/Suppress [doc. #155]; Memo in Support of M/Suppress [doc. #155-1]).

On August 13, 2024, the Government filed its response to the motion, wherein it argued that: (1) the wiretap application was not tainted, as the confidential source had been reliable prior to the submission of the application and had been arrested after the application was submitted; (2) the application did show that other investigative procedures had been tried and failed, were unlikely to succeed if tried, or were too dangerous; (3) minimization was appropriately implemented; (4) the pen register application was not tainted, and further, suppression is not a remedy for fault with a pen register application; (5) the intercepted conversations between Ard and Parks and Ard and Wright did have one individual named in the order as a party to the conversation, the defendant himself; and (6) Ard's arrest was valid and did not violate the silver platter doctrine. (*See* Gov't Response [doc. #181]).

Ard did not file a reply brief. Accordingly, the matter is ripe.

## Law and Analysis

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. AMEND. IV. The protections of the Fourth Amendment extend to the states through the Fourteenth

4

Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted). "The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

In the context of wiretaps, which involve the interception of the contents of communications, the Supreme Court has held that such interceptions constitute "searches" within the meaning of the Fourth Amendment, and therefore, are subject to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 353 (1967). Title III of the Omnibus Crime Control and Safe Streets Act of 1968 governs the use of wiretaps and mandates stringent procedures, including a requirement for probable cause and judicial authorization, to ensure compliance with the Fourth Amendment. Suppression is an appropriate remedy for any conversations unlawfully intercepted in violation of Title III. *United States v. Giordano*, 416 U.S. 505, 528 (1974).

Pen registers are not considered searches under the Fourth Amendment. *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). Consequently, pen registers do not pose threats to privacy of the same dimension as the interception of oral communications, and Title III restrictions cannot

be imposed on pen registers. *United States v. New York Tel. Co.*, 434 U.S. 159, 168 (1977). The Pen Register Act, 18 U.S.C. §§ 3121-3127, establishes the procedures for their use, requiring only a court order based on a certification by law enforcement that the information likely to be obtained is relevant to an ongoing criminal investigation. Suppression is not an available remedy for claims alleging a violation of the pen-trap statute. *United States v. German*, 486 F.3d 849, 854 (5th Cir. 2007). Instead, fines and imprisonment are remedies provided in the statute. *Id.*

Accordingly, the applicability of the exclusionary rule depends on whether the evidence was obtained in violation of the applicable constitutional or statutory standards governing wiretaps and pen registers. Suppression of evidence should be considered only on a case-by-case basis and only where exclusion will further the purposes of the exclusionary rule. *Pope*, 467 F.3d at 916.

## I.        Request for a Hearing

Ard has requested a hearing on this motion. Before proceeding, the undersigned determines whether a hearing is merited.

Evidentiary hearings concerning motions to suppress are required "only when necessary to receive evidence on an issue of fact." *United States v. Alfaro*, 638 F. App'x 374, 375 (5th Cir. 2016) (quoting *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983)). Hearings of this nature "are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief." *United States v. Regan*, 832 F. App'x. 898, 899 (5th Cir. 2021) (quoting *Harrelson*, 705 F.2d at 737). Factual allegations in the defendant's motion must be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. *Harrelson*, 705 F.2d at 737. "Inherent in these flexible guidelines" is a recognition of the reviewing court's discretion to determine whether "the particular facts which attend [the] particular request" require a hearing. *Id.* (quoting *United States*

v. *Losing*, 539 F.2d 1174, 1178 (8th Cir. 1976)). "Where a motion to suppress fails to raise any material issue of fact, the district [court] has the discretion to deny the motion without an evidentiary hearing." *United States v. Parfait*, No. 06-60023, 2006 WL 2356010, at *1 (W.D. La. Aug. 15, 2006).

Here, Ard has not alleged sufficient facts which, if proven, would justify relief. Critically, there are no substantive issues of fact. Both Ard and the Government agree that Ard was named on the wiretap order while Parks and Wright were not. (M/Suppress [doc. #155, p. 6, ¶6]; Gov't Response [doc. #181, p. 8, ¶7]). They both agree that there was a controlled purchase on January 19, 2023. (M/Suppress [doc. #155, p. 4, ¶2]; Gov't Response [doc. #181, p. 5, ¶2]). They also agree that the confidential source was arrested for retaining buy funds and narcotics from a controlled purchase. (M/Suppress [doc. #155, p. 4, ¶2]; Gov't Response [doc. #181, p. 5, ¶2]). Ard contends the arrest occurred on January 19, 2023; however, the Government's evidence indicates that the confidential source was arrested on June 20, 2023.[1] *Id.* Additionally, both concur that a pen register and trap device order, as well as orders authorizing the interception of wire and electronic communications, were issued for Ard's telephone number. (M/Suppress [doc. #155, p. 4, ¶¶2, 3]; Gov't Response [doc. #181, p. 2]). Further, they both agree that there is a minimization requirement for the interception of wire and electronic communication. (M/Suppress [doc. #155, p. 5, ¶5]; Gov't Response [doc. #181, pp. 6-7, ¶5]). Finally, they both agree that Ard was indicted on federal charges. (M/Suppress [doc. #155, p. 7, ¶10]; Gov't Response [doc. #181, p. 9, ¶10]). These facts are essentially the sum total of the allegations presented in Ard's motion.

---

[1] Ard makes this assertion without any evidentiary support in contrast to the DEA investigatory report provided by the Government. His belief is insufficient to require a hearing.

The undersigned finds that these factual allegations do not lead to the conclusion that Ard has presented a claim sufficiently substantial to merit a hearing. Moreover, as discussed *infra*, these undisputed facts are sufficient to rule on the lawfulness of the challenged pen register order and the constitutionality of the interception of the wire and electronic communications.

## II.    Discussion

### (a) Application for Wiretap

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 empowers a federal judge to authorize wire, oral, or electronic communication interceptions upon compliance by law enforcement agents with statutory prerequisites." *United States v. Guerra-Marez*, 928 F.2d 665, 669 (5th Cir. 1991) (citing 18 U.S.C. §§ 2510-2521). However, Title III generally prohibits the interception of such communications without consent unless there is prior judicial approval. *United States v. Herrera Romero*, 832 F. App'x 868, 872 (5th Cir. 2020) (citing 18 U.S.C. §§ 2510-2520).

"When an affiant relies upon information obtained from an informant, the affiant must provide sufficient information to allow the magistrate to determine, by reviewing the totality of the circumstances, whether the informant's information is sufficient to create probable cause." *United States v. Brown*, 567 F. App'x. 272, 282 (5th Cir. 2014) (citation omitted). A confidential informant's "'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant" factors to consider. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). However, a deficiency in one factor "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *United States v. Jackson*, 818 F.2d 345, 348 (5th Cir. 1987) (citation omitted).

Ard challenges the affidavit submitted for the order of the wiretap on the basis that the confidential source that provided information was later deemed unreliable. (M/Suppress [doc. #155, p. 4, ¶2]). Ard contends that the wiretap application "failed to establish that [the confidential source] was arrested on [January 19, 2023] for keeping OAF (buy money) and narcotics." *Id.* The Government maintains that the arrest of the confidential source occurred on June 20, 2023, and since the wiretap application was signed on June 7, 2023, the arrest could not have been disclosed in the affidavit. (Gov't Response [doc. #181, p. 5, ¶2]; Gov't Exhibit 2 [doc. #181-2, p. 4]).

Prior to the confidential source's arrest, the confidential source had been working with the Metro Narcotics Unit Task Force (MNU) for at least six months prior to the wiretap application being submitted. (Gov't Exhibit 4 [doc. #181-4, p. 12, ¶21]). MPD High Enforcement Apprehension Team ("HEAT") officers encountered the confidential source during a narcotics investigation, and the confidential source provided investigators with the identity of Ard. *Id.* at pp. 12-13, ¶21. The confidential source had known Ard for over ten years and had purchased narcotics directly from him in the past. *Id.* at pp. 12-13, ¶¶20, 21. Considering the confidential source's established history with Ard, the source had a credible basis of knowledge regarding Ard's activities. The confidential source also agreed to participate in five controlled purchases, all of which were successful. *Id.* at pp. 12-14, ¶¶21, 24.

The affidavit supporting the wiretap application included detailed information regarding the confidential source's involvement with law enforcement, including the source's participation in the five successful controlled purchases. (*See* Gov't Exhibit 4 [doc. #181-4, pp. 12-23, ¶¶20-46]). This level of detail indicates that the affiant relied on substantive evidence rather than mere rumor or hearsay. Furthermore, at the time of filing the wiretap application, the affiant had no basis to believe that the confidential source was unreliable, as the confidential source had provided

accurate and valuable information throughout the investigation and had successfully participated in five controlled purchases.  The confidential source had cooperated with both the MNU and HEAT.  Importantly, since the confidential source's arrest occurred after the filing and signing of the application, the affiant could not have foreseen this development.

Considering the totality of the circumstances, Ard's claim that the wiretap application was tainted due to the unreliability of the confidential source lacks sufficient factual support.  The affidavit provided adequate details to satisfy the legal requirements for establishing the reliability of the confidential source, and there is no indication that any information was improperly included or omitted from the wiretap application.  Therefore, the motion to suppress on this basis is not warranted.

Additionally, Ard contends that the wiretap application, which stated in part that agents believed Mario Jones Jr. ("Jones Jr.") and Ard were connected through Monterius Simpson ("Simpson") and that Ard and Simpson had frequent communications, is "misleading information with reckless disregard from the truth."  (M/Suppress [doc. #155, p. 4, ¶4]).   The Fifth Circuit acknowledges that "[s]pecial problems are presented when the affidavit in support of the wiretap application allegedly contains intentional or reckless misrepresentations or falsehoods."  *Guerra-Marez*, 928 F.2d at 670.  "[I]mplicit in the fourth amendment's Warrant Clause is the assumption that factual allegations necessary to support a finding of probable cause must be *truthful*."  *Id.* (quoting *Franks v. Delaware*, 438 U.S. 154, 164 (1978)).  However, "truthful" does not mean that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be found upon hearsay and upon information received from informants, "[b]ut surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."  *Franks,* 438 U.S. at 165.

10

In this case, Ard has not sufficiently demonstrated that the statements in question were misleading or were made with a reckless disregard for the truth. The Government asserts that the statements regarding the connection between Jones Jr. and Ard through Simpson, as well as their frequent communications, were included based on the agents' reasonable belief in the accuracy of the evidence available to them at the time. (Gov't Response [doc. #181, p. 6, ¶4]). The agents' reliance on the information they had, even if later proven inaccurate or incomplete, does not necessarily indicate a deliberate or reckless misrepresentation.

Therefore, given that Ard has not provided adequate evidence to substantiate claims of intentional or reckless falsification, and considering that the agents acted based on the evidence they reasonably believed to be accurate, IT IS RECOMMENDED that the Motion to Suppress be denied with regard to the allegedly defective application.

### (b) Other Investigative Procedures

An application seeking a wiretap order must establish that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Herrera Romero*, 832 F. App'x at 872 (quoting 18 U.S.C. § 2518(1)(c)). "[T]he purpose of § 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Butler*, 477 F. App'x 217, 220 (5th Cir. 2012) (quoting *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir. 1984)). "What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *Id.* (quoting *United States v. Krout*, 66 F.3d 1420, 1424-25 (5th Cir. 1995)).

Ard contends that "the application failed to meet the dictates of 18 U.S.C. 2518(3)(c), which requires the Government to show and the issuing judge to find that normal investigative

procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." (Memo in Support of M/Suppress [doc. #155-1, pp. 3-4]). However, the investigators had attempted various alternative investigative techniques without successfully identifying Ard's supply sources or co-conspirators. (*See* Gov't Exhibit 4 [doc. #181-4, pp. 26-40]). For instance, the one confidential source that the investigators found was unable to obtain information regarding Ard's sources or who his co-conspirators were. *Id.* at pp. 28-29, ¶¶59, 60. The investigators attempted physical surveillance, pole cameras, and reviews of social media, but these investigative tactics did not produce the information that the investigators were searching for. *See id.* at pp. 26-40. The affiant also detailed that attempts to use undercover agents, grand jury, interviews, search warrants, and trash pulls would likely fail for a variety of reasons. *Id.* Additionally, the pen register did not reveal any criminal activity due to its inability to identify the parties involved in the communications. *Id.* at pp. 23-24, ¶49.

"The government is not required to prove exhaustion of every conceivable option before a wiretap order can be issued, and a common sense view of statements contained in the application is taken to determine if the statutory 'necessity' requirement is satisfied." *United States v. Kelley*, 140 F.3d 596, 605 (5th Cir. 1998) (citing *Guerra-Marez*, 928 F.2d at 669). In this case, the Government has made a sufficient showing of necessity. The fact that other investigative methods produced some evidence does not negate the necessity of a wiretap to advance the investigation.

Moreover, the Fifth Circuit has consistently upheld the issuance of a wiretap authorization where the government sought to expand its investigation into the full scope of a criminal enterprise, and traditional investigative techniques, though productive of some evidence, could not reveal that scope. *Butler*, 477 F. App'x at 220; *see also Kelley*, 140 F.3d at 604-05 (upholding denial of a motion to suppress wiretap evidence where, despite investigative efforts, the government had

uncovered information about the drugs' origin and the participants' identities, but "was never able to determine the source and volume of the trade").  Here, while the Government successfully identified some co-conspirators and verified Ard's distribution and possession, it did not uncover the sources of supply or all co-conspirators.  The investigative techniques employed from January 2023 to June 2023, including physical surveillance, controlled buys, pole cameras, and social media reviews, did not provide the information sought.

Accordingly, IT IS RECOMMENDED that the Motion to Suppress the wiretap evidence be denied based on failure to show other investigative efforts, given that the Government had adequately shown the wiretap was necessary after other methods proved insufficient.

### (c)  Minimization of Interception of Conversations

Section 2518(5) requires that wiretap surveillance "'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception[.]'"  *Herrera Romero*, 832 F. App'x at 874 (quoting 18 U.S.C. § 2518(5)).  To comply with § 2518(5), the "government's efforts to minimize interception of non-pertinent conversations must be objectively reasonable in light of the circumstances confronting the interceptor."  *Id.* (quoting *United States v. Brown*, 303 F.3d 582, 604 (5th Cir. 2002)).  In keeping with this reasonableness standard and its variance with each case's facts, the Supreme Court has cautioned that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer."  *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 140 (1978)).  In assessing the objective reasonableness of the Government's minimization practices, courts consider three factors: "'(1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision.'"  *Brown*, 303 F.3d at 604 (quoting *Hyde*, 574 F.2d at 869).

Ard has failed to specify any particular conversations that should have been suppressed. His failure to identify specific, excludable evidence is fatal to his claim, as the Fifth Circuit has rejected total suppression for minimization violations. *See Herrera Romero*, 832 F. App'x at 873. Nonetheless, the undersigned will proceed to review the relevant factors to assess whether the Government adhered to the minimization requirement.

The first factor requires an examination of the "nature and scope of the criminal enterprise under investigation." *See id.* at 874.  In this case, agents suspected that three different groups were involved in a conspiracy to distribute and possess controlled substances that networked with each other through their individual leaders.  (Gov't Exhibit 4 [doc. #181-4, p. 5, ¶7]).  Additionally, the agents believed that these conspirators were traveling to and from Monroe, Louisiana, and Houston, Texas, to accomplish their goals of possessing and distributing controlled substances.  *Id.* at pp. 6-7, ¶9.  At the time of the investigation, the investigators did not have complete knowledge of the participants or the full scope of the drug conspiracy.  Although the investigative techniques employed prior to the wiretap yielded some evidence, they were insufficient to provide a comprehensive understanding of the conspiracy's scope, including the identities of other participants and the supply source(s).  Given this incomplete picture, agents would reasonably need to monitor conversations and listen to the beginning of each conversation to ascertain whether the parties involved were co-conspirators and to find the supply source(s). This factor weighs in favor of the Government.

"Regarding the second factor—the extent to which Government can readily make reasonable inferences of conversation's character and participants—this court has recognized that the reasonableness of the Government's minimization rates will vary with each case's facts." *Herrera Romero*, 832 F. App'x at 874.  Deference is afforded to law enforcement "during the initial

phase of an investigation, when the precise scope of and participants in the criminal scheme have not yet been identified." *Brown*, 303 F.3d at 604.  Moreover, "[w]here drug jargon is used over the phone, the government may engage in more extensive wiretapping and the interception of innocent calls may be a more reasonable activity." *United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992) (citing *United States v. Macklin*, 902 F.2d 1320, 1328 (8th Cir. 1990)).

Here, the Government encountered conversations involving drug-related jargon.  For instance, in one phone call between Ard and Parks, language like "make the mojo" was used. (Gov't Response [doc. #181, p. 3]).  As the agents were attempting to identify co-conspirators in a drug distribution conspiracy, it was anticipated that they would encounter various conversations involving drug terminology.  Agents were authorized to intercept for a reasonable duration, "usually not in excess of two minutes," to determine whether the conversation concerns criminal activities.  (Gov't Exhibit 1 [doc. #181-1, p. 2, ¶6]).  Furthermore, agents were instructed by the Assistant U.S. Attorney to minimize non-pertinent and privileged calls, with both the Assistant U.S. Attorney and agents signing the written document affirming the minimization requirements. *See* (Gov't Exhibit 1 [doc. #181-1, pp. 1-9]).   The agents had clear rules regarding minimization, and there are no specific assertions by Ard that the agents failed to comply with these rules as to any particular conversations.

During the thirty days the wiretap was used, 1,746 calls and 1,946 text messages were intercepted, out of which 1,220 calls and 1,506 text messages were minimized.  (Gov't Response [doc. #181, p. 2]).  The agents effectively minimized around 73.8% of the calls and texts received. *Id.*  Given that the agents were in the process of ascertaining the scope and participants of a multi-drug operation, their actions in minimizing non-pertinent communications should be afforded deference.  The necessity of sufficient time to review and assess the content of the intercepted

communications to ensure accurate identification and minimization of non-relevant material further supports the reasonableness of their efforts.  This factor weighs in favor of the Government.

Finally, the third factor requires the Court to consider the extent of judicial supervision over the wiretap operation.  The agents submitted a 15-day report to Judge Maurice Hicks, providing updates on the individuals intercepted.  (Gov't Response [doc. #181, p. 4]).  This ongoing judicial oversight supports the conclusion that the minimization requirements were adhered to.  This factor weighs in favor of the Government.

Given the nature and scope of the investigation, the Government's reasonable efforts in minimizing non-pertinent conversations, and the extent of judicial supervision, the evidence obtained from the wiretap is admissible, and IT IS RECOMMENDED that the Motion to Suppress be denied as to the claim of improper minimization practices.

*(d) Pen Register*

Ard moves to suppress all evidence derived from the pen register, asserting that its installation was predicated on "tainted and insufficient evidence."  (M/Suppress [doc. #155, p. 4, ¶3]).  Ard's memorandum in support of this motion focuses exclusively on the suppression of evidence obtained via the pen register, contending in its conclusion that the "Pen Registry Application was unconstitutionally defective and all evidence obtained after the Order was signed should be suppressed and ruled inadmissible."  (Memo in Support of M/Suppress [doc. #155-1, p. 4]).

In his argument, Ard relies on Title III of the Omnibus Crime Control and Safe Streets Act of 1968 to govern the use and authorization of pen registers.  *Id.* at pp. 1-4.  However, the Supreme Court has explicitly clarified that the provisions of Title III are inapplicable to pen registers.  *New York Tel. Co.*, 434 U.S. at 166.  Title III is concerned only with orders "authorizing or approving

the *interception* of a wire or oral communication . . ." *Id.* (quoting 18 U.S.C. § 2518(1)). Furthermore, Congress has defined "intercept" to mean "the *aural* acquisition of the *contents* of any wire or oral *communication* through the use of any electronic, mechanical, or other device." *Id.* (quoting 18 U.S.C. § 2510(4)). Pen registers do not qualify as an "intercept" since they do not acquire the "contents" of any communications; they merely record the numbers dialed and are incapable of acquiring sound. *Id.* Additionally, in *Smith*, the Supreme Court held that the non-content surveillance of a pen register is an insufficient invasion of privacy to implicate the Fourth Amendment. 442 U.S. at 742. The Fifth Circuit has further declined to extend the exclusionary rule to statutory violations of the pen-trap statute. *German*, 486 F.3d at 854. Thus, Ard's contention that a pen register must adhere to Title III's requirements is unfounded, and suppression is not a viable remedy for any alleged statutory violations involving a pen register.

Ard further contends that the pen register order is defective for "failing to comply [with the] mandates for warrants for a tracking device found in Rule 41 of the Federal Rules of Criminal Procedure. (Memo in Support of M/Suppress [doc. #155-1, p. 4]). The Supreme Court has concluded that Rule 41 authorizes the use of pen registers under appropriate circumstances. *New York,* 434 U.S. at 170. Rule 41(c)(1)-(4) of the Federal rules of Criminal Procedure authorizes the issuance of a warrant for: "(1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained." This authorization is broad enough to encompass a "'search' designed to ascertain the use which is being made of a telephone suspected of being employed as a means of facilitating a criminal venture and the 'seizure' of evidence which the 'search' of the telephone produces." *New York,* 434 U.S. at 169. Despite this, Ard fails to specify how the pen register order fails to comply with the requirements

of Rule 41.  Ard merely offers a conclusory statement devoid of any factual basis to substantiate the claim.

Finally, Ard argues that suppression is warranted because the pen register "should not have been installed based on tainted and insufficient evidence."  (M/Suppress [doc. #155, p. 4, ¶3]). However, Ard does not identify what specific evidence he considers tainted or insufficient. Previously, Ard argued that the wiretap order was tainted due to the confidential source's subsequent arrest.  To the extent Ard attempts to extend this argument to the pen register, it is unavailing for the same reasons discussed above regarding the wiretap order.

Therefore, IT IS RECOMMENDED that the Motion to Suppress be denied as to evidence obtained from the pen register.

### (e) Applicability of Gaytan to Intercepted Communications

Next, Ard seeks to suppress conversations between Parks and him, as well as those between Wright and him, based on the "Gaytan Applicability."  (M/Suppress [doc. #155, p. 5, ¶6]).  In *United States v. Gaytan*, the government intercepted numerous phone calls that did not involve any of the individuals specifically named in the wiretap order.  74 F.3d 545, 554 (5th Cir. 1996).  The court in *Gaytan* excluded from evidence any intercepted conversations that did not include a named party in the wiretap order.  *Id.*

Ard argues that, since neither Wright nor Parks were named in the wiretap order, all conversations between these individuals and him should be excluded from evidence.  (M/Suppress [doc. #155, pp. 5-6, ¶¶6, 7]).  Here, "[t]he Order of the United States District Court for the Western District of Louisiana only authorizes the interception of wire and electronic communications (SMS text messages) of James Ard Jr., a.k.a "BOOGER" ("ARD") . . ."  (Gov't Exhibit 1 [doc. #181-1, p. 1, ¶2]).  The ruling in *Gaytan* only mandates the exclusion of conversations intercepted when

18

none of the participants in the conversation were named in the order. 74 F.3d at 554. In this case, Ard was directly named in the wiretap order; therefore, any conversations between Ard and Wright or Parks should not be excluded, as Ard was a party to the communications.

Therefore, IT IS RECOMMENDED that the Motion to Suppress on the basis of the *Gaytan* decision be denied.

### (f)  Silver Platter Doctrine

Finally, Ard moves to suppress all evidence against him because his arrest violated the "silver platter doctrine."

In *Elkins v. United States*, the Supreme Court exercised its supervisory powers to eliminate what was known as the "silver platter doctrine." 364 U.S. 206 (1960). Prior to *Elkins*, state officers were allowed to transfer to federal officers evidence obtained in violation of the United States Constitution. *United States v. Eastland*, 989 F.2d 760, 766 (5th Cir. 1993). Now, "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Elkins*, 364 U.S. at 223.

In the present case, Ard contends that his arrest was "in violation of the 'Silver Platter Doctrine' [as his] [c]o-[d]efendant Trestin Parks et. al were arrested according to a state offense. The defendant was [superseded] into the Federal Indictment through T. Parks and this violated the Silver Platter Doctrine." (Motion to Suppress [doc. #155, p. 7, ¶10] (brackets and spelling in original)). Ard has failed to state facts that show his arrest violated the silver platter doctrine. Ard was not arrested on state charges in this matter. (Gov't Response [doc. #181, p. 9, n. 2]). The

mere fact that Ard's Co-Defendants were initially arrested on state charges before a federal indictment was returned does not constitute a violation of the silver platter doctrine.

To establish a violation of the doctrine, Ard would need to provide specific facts indicating that state officers obtained evidence in violation of the Fourth Amendment (or otherwise violated his Constitutional rights) and subsequently transferred that evidence to federal authorities. Ard's assertion fails to demonstrate or suggest that any evidence was unlawfully obtained by state officers and then handed over to federal authorities for use in federal proceedings. Without concrete facts showing that state-gathered evidence was illegally transferred to federal officers, Ard's claim lacks merit.

IT IS RECOMMENDED that the Motion to Suppress be denied on the basis of the silver platter doctrine.

## Conclusion

For the above stated reasons,

IT IS RECOMMENDED that the Motion to Suppress [doc. #155] filed by Defendant, James Ard, be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS**

**REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 13th day of September, 2024.

Type text here

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE